**IN THE UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

v.                                                    **Case No: 1:23-cr-00122 (APM)**

**STEVEN PRICE**
**KEIDI MOORE**
                    **Defendants**

**DEFENDANT MOORE'S NOTICE OF INTENT TO OFFER**

**TESTIMONY OF KRISTAL RODRIGUEZ**

Defendant Keidi Moore, through counsel, respectfully provides notice of her intent to

offer the testimony of Kristal Rodriguez during the presentation of her defense, if necessary.

Just as with the government's notice of its witnesses, Ms. Moore does not concede that Ms.

Rodriguez' testimony constitutes expert witness testimony pursuant to Federal Rules of Evidence

702, 703, and 705, and reserves the right to argue to the contrary, but out of an abundance of

caution Ms. Moore hereby gives notice of expert witness testimony pursuant to Federal Rule of

Criminal Procedure 16(b)(1)(C).

I.        Anticipated Testimony of Ms. Rodriguez

Ms. Moore anticipates that Ms. Rodriguez will testify regarding standard dental office

administration and operations, and in particular will testify about how the electronic dental

records system, Open Dental, works, how it is programmed, how she trains on it, how it should

be used and how it is often not used as designed, and what the Open Dental records of The Smile

Center reflect.

II.     Background and Credentials of Ms. Rodriguez

Ms. Rodriguez's CV is attached.

Ms. Rodriguez has worked in the dental industry since 2008 in both clinical and

administrative roles. She started as a dental assistant, worked the front desk and then became

assistant manager at a dental practice.  In 2015 she became manager at Premier Dental in

Arcadia, California.  By 2020, Ms. Rodriguez became regional manager of the orthodontic

department of Imagine Dental in San Antonio, Texas.

Ms. Rodriguez has been in the dental field since 2008 and consulting for dental practices

since 2020.  Her consulting includes compliance with the billing rules and regulations of third-

party payors for dental services, such as Medicaid, Medicaid managed care entities and private

dental insurance plans.  She also provides guidance on office operations to enhance efficiency

and productivity within dental practices.  She counsels on the scope of work limitations of

various providers and assistants within dental offices and teaches the limitations based on the

state of the practice she is counseling.  She also guides her clients based on the laws and

regulations within the state of the client, such as the regulations of the boards of dentistry for the

applicable state.

Ms. Rodriguez has been using Open Dental extensively since 2013 and provides

consulting services to individual dental practices to tailor the settings for each particular practice.

She knows how to manage the software's capabilities to maximize the efficiency, accuracy, and

proficiency of individualized dental office operations.  She also provides training to dentists and staff on the proper use of Open Dental and on all its updates.  With respect to the electronic dental records systems of her clients, she consults exclusively on the Open Dental system.

Ms. Rodriguez has assisted at least ten dental practices with setting up and/or operating existing Open Dental systems in their practices.  She has trained approximately 100 to 200 people from many more than the ten dental offices on the use and operations of Open Dental. She teaches dental office teams on how to fully integrate Open Dental into their daily processes—from scheduling and patient communication to insurance verification, claims submission and processing, and reporting. She focuses on real-world applications, ensuring that teams feel confident and empowered to use Open Dental to its fullest potential. The combination of hands-on dental experience and advanced software expertise allows her to bridge the gap between technology and practical office needs, ultimately helping practices improve efficiency, increase revenue, and deliver exceptional patient care.

To prepare for her potential testimony, she has extensively reviewed and analyzed the Open Dental data of The Smile Center provided to her by Ms. Moore's counsel.  She also reviewed other materials and discovery produced by the government when reference thereto assisted her ability to understand and analyze the Open Dental data or the TSC operations.  For instance, she has reviewed and studied the indictment in this case to understand the government's allegations and particular dates and patients specified in the indictment.  She is able to draw on her rounded experience in dental office operations when interpreting various TSC Open Dental records.

III.    <u>Open Dental Fundamentals</u>

    a.   <u>Basic Design Flaw of Open Dental</u>

Ms. Rodriguez frequently identifies dental practices that do not use Open Dental's program according to design, in that entries are made with the credentials open at a terminal that are not the credentials of the person making the entry.  In that way, the "user" identified in the Open Dental records is not the person who made the entry.  She more often confronts this issue with her clients if she did not help install the Open Dental software and train the users from the outset, because Open Dental is designed to capture the person providing services through that person's log-in credentials, which requires that, before making an entry, the user log into the computer terminal where information on the services provided is being input, or change the user's identity when the terminal is logged on in someone else's credentials.    Based on the nature of dental practices, Ms. Rodriguez has found that this design frequently results in inaccurate recordation of the identity of the provider of services for at least three reasons:  1) dental providers will frequently try to keep up with the input of services provided without taking the time or trouble to change the credentials of whomever is logged into a terminal when making entries, particularly given the pace of moving from patient to patient; 2) dentists will frequently direct those working with them, whether dental hygienists, dental assistants or other administrative personnel, to record procedures provided to patients while or just after they are provided, which often get recorded under the credentials of the other person rather than the dentist; and 3) some dental offices never train its personnel to make entries in Open Dental only under their own user credentials and terminals may be open for days and weeks at a time under only one user's credentials.  From her review of TSC's Open Dental data, the identity of the "user" in the TSC records is a very unreliable indicator of the person who provided the services

or made the entry.  It is apparent to Ms. Rodriguez that the personnel at TSC were not properly trained on the use of Open Dental.

       b.   <u>Government Report Regarding Auto Log On/Off</u>

Ms. Rodriguez reviewed a government report of an interview with an Open Dental engineer who advised the government that Open Dental has a feature to automatically log off users after a specified period of time, but that feature must be activated.  The government report reflects that the government was advised that the auto-log-off feature was not enabled on TSC's system.  That determination is consistent with Ms. Rodriguez's review of TSC's Open Dental records.  In fact, in all the offices at which she has worked or consulted with Open Dental, only one office activated the auto-log-off feature.

Ms. Rodriguez's review of TSC's Open Dental records reflect that individual user credentials, particularly those of Ms. Moore, were not automatically logged off and, instead, were open on TSC terminals for days and weeks at a time, which means that any person in the office making entries at that terminal during that period of time made the entries under the credentials of, in most instances, Ms. Moore.  This is one of several reasons that Ms. Rodriguez found that the user credentials reflected in Open Dental entries at TSC are not a reliable indicator of the person who provided a service or made an entry about that service in TSC's Open Dental system.

       c.   <u>Typical and Specific Use of Ms. Moore's and Other's Credentials</u>

          i.   <u>Open days and weeks at a time</u>

As addressed more specifically *infra*, for each date identified in the indictment alleging Open Dental entries by Ms. Moore, her credentials were logged in at the terminal where alleged

false entries were made for days and sometimes weeks at a time. All entries made during each period were made under her credentials irrespective of who made the entries. In addition, for each entry under Ms. Moore's credentials of a CCL or SM procedure, there was a dentist available to provide the procedure and/or make the entries for the procedure using Ms. Moore's credentials and/or request that an assistant such as Ms. Moore make the entries. Therefore, TSC's Open Dental records do not infer that Ms. Moore made any particular CCL or SM entry into the system – including for the dates identified in the indictment -- or decided whether the entry should be made, even if they were entered under her credentials.

d.  Unreliability of User Credentials at TSC

There are many illustrations within TSC's Open Dental records indicating that the user's credentials are not a reliable indicator of the person who made a given entry. Some examples include:

i.  Dr. Angole's credentials unused entirely for nine months during conspiracy and sporadically otherwise

Ms. Rodriguez examined the records of Dr. Angole during her entire time at TSC. The records reflect that Dr. Angole worked at TSC from January 28, 2014, to November 29, 2017, and from August 30, 2018, to May 28, 2020. During those two periods of time, the Open Dental records reflect that Dr. Angole saw at least one patient and completed at least one procedure on her schedule on 371 different days, but her credentials were only used during 175 of those days. That is, on at least 196 of the days that Dr. Angole provided services at TSC, she did not use her own credentials to make a single entry in Open Dental. In addition, for most of the 175 days when her credentials appear in the audit trail, they appear so few times as to indicate she made

many other entries on those days using the Open Dental credentials of others. Moreover, while the records reflect Dr. Angole was treating patients at TSC during the specific period of October 2, 2018, to June 27, 2019, there are absolutely no entries in Open Dental under Dr. Angole's credentials during that stretch of almost nine months. Assuming a very modest 35 entries per working day during those nine months, Ms. Rodriguez estimates that Dr. Angole made more than 6000 entries using other people's credentials during that nine-month period of time alone, particularly using the credentials of Dr. Price and Ms. Moore.

> ii.  <u>Ms. Porter used the credentials of others for more than two months</u>
> <u>during period of alleged conspiracy</u>

Ms. Rodriguez was able to determine that Office Manager Porter used the credentials of others for more than two months during one stretch of 2018 to 2019, which was within the period of the alleged conspiracy identified in the government's indictment. When using her own credentials, Ms. Porter made on average 300 entries into Open Dental per day. Ms. Rodriguez estimates that during one period of more than two months in late 2018 to early 2019, Ms. Porter made more than 12,000 entries into Open Dental using credentials other than her own.

> iii.  <u>Dentists used Ms. Moore's Credentials to Enter Prescriptions</u>

Ms. Rodriguez also identified entries under Ms. Moore's credentials for the issuance of prescriptions, but when further examining the surrounding entries within TSC's Open Dental records she was able to determine that dentists were using Ms. Moore's credentials to make the prescription entries. In fact, Ms. Rodriguez determined that TSC dentists frequently used the credentials of Ms. Moore and Ms. Porter to make entries for prescriptions.

IV.     The Operations of a Dental Office

    a.     Functions of Dental Assistants and Hygienists

Ms. Rodriguez recognized from the allegations in the government's indictment that it appears the government makes assumptions inconsistent with the normal operations of a dental practice.  For instance, the government seems to want to attribute entries of dental procedures under Ms. Moore's credentials as independent decisions by her.  Although the user credentials are not a reliable indicator of the identity of the person who made a particular entry at TSC, if entries of dental procedures were made by Ms. Moore, hygienists frequently assist dentists with dental procedures and operations, often after providing hygienist treatment.  In the course of that assistance function, dentists will frequently request or instruct the assisting hygienist – or other dental assistants – to make entries into the electronic records of dental procedures planned or provided. Oftentimes, the dentist literally have their hands in a patient's mouth when making the request. It is common and normal for dental procedures to be entered under the credentials of a dental assistant or dental hygienist on the instruction or request of a dentist; the dentist must thereafter sign that the services were rendered to complete the chart, but there is nothing inappropriate about the dental procedure being recorded under the credentials of a dental assistant or dental hygienist.  Such entries are an administrative function that do not indicate the provider of the service; the provider of service is the person who signs for the provision of the service.  To the extent that Open Dental's design is intended for the user's credentials to reflect the provider of services for each entry, Ms. Rodriguez sees that as a weakness in Open Dental's design.

Ms. Rodriguez understands the scope of license for dental hygienists in general and understands DC's scope of license for dental hygienists in particular, which is attached.  She is

informed that the government alleges that some witnesses claim Ms. Moore practiced dentistry beyond the scope of her dental hygienist license.  Ms. Rodriguez knows that a dental hygienist in DC is licensed to provide temporary fillings and crowns, which may cause confusion among some witnesses.  A dental hygienist is not licensed to perform CCL procedures.  A dental hygienist in DC is licensed to assist with such things as imaging and molds for space maintainers and the appliances identified as space maintainers throughout TSC's Open Dental records, but a dentist must sign for the ultimate provision of a space maintainer, including the dental appliances that are identified as space maintainers in TSC's records.

b.  <u>Placement of Patients</u>

Ms. Rodriguez is familiar with typical dental practices, particularly those with Medicaid patients, and understands that patients are typically placed in an available dental chair and that providers rotate from dental chair to dental chair to provide the appropriate services to the patient.  Therefore, if a patient is scheduled for both dental hygiene procedures and dental procedures, the dental hygienist and dentist will rotate from dental chair to dental chair rather than move the patient from one chair to another; in other words, the providers rotate rather than the patients.  The Medicaid patient base often includes patients with mental, physical and emotional disabilities, which makes it more likely that the providers rotate to the patient rather than trying to rotate the patient to different provider positions.

It is also common for dental practices to seek efficiency by having an idle and available dentist provide dental treatment to a patient who is otherwise scheduled to see a dentist who is busy with other patients.  Therefore, records of the dentist scheduled to treat a particular patient are sometimes unreliable.

c.   The Claims Submission Process

Ms. Rodriguez provides consulting services to dental practices on the claims submission process to all payors, including both private and government insurance providers, including, in particular, Medicaid.  She knows the electronic records reflecting the claims process, including the records of Open Dental.  She determined that the user credentials of Dr. Price and Ms. Porter are the only two that were used in TSC's claims submission process, and that Ms. Moore's credentials were not used for anything related to TSC's claims submissions, including to Medicaid.  Further she would not expect to see a dental hygienist's user credentials associated in any capacity with claims submissions.

Ms. Rodriguez knows that one of Medicaid's requirements prior to the submission of a claim for payment is that the procedure for which payment is sought must first be signed by the provider.  This requirement is generally known throughout the dental industry, and she would expect both a dental practice's claims administrator, in TSC's case Ms. Porter, and the practice's owner, in TSC's case Dr. Price, to know of that requirement.  Her analysis of TSC's claims data indicated that TSC routinely failed to comply with that requirement.   During the period of 2017 to 2022, TSC submitted 395 claims to Medicaid that included unsigned procedures seeking payments of $253,277 and on which Medicaid paid $205,586.

d.   The CCL Entries at TSC

Ms. Rodriguez is informed that the government's position is that the CCL procedure is performed by cutting into the gum and bones, primarily with a scalpel, causing bleeding and requiring sutures and a prolonged period of healing.  Based on her review of TSC's records Ms. Rodriguez is able to assess that from the perspective of someone working at TSC, particularly

10

someone who went to work for Dr. Price directly out of dental hygiene school in 2010 and worked only for Dr. Price  through 2022, the CCL procedure at TSC was not performed as the government describes the procedure.

The description of the CCL procedure contained in TSC's chart notes, which reference ADA code D4249, consistently describe a procedure performed with a perio or other laser device rather than with a scalpel and made no reference to bleeding or a need for sutures or anesthesia or a prolonged period of healing. Ms. Rodriguez is familiar with dentists performing the CCL procedure both with a scalpel and with a laser: the scalpel involves cutting, bleeding, sutures, anesthesia and a prolonged period of healing; and lasers cause little to no bleeding, do not require sutures, may require anesthesia or a topical and requires a minimal period of healing.  For purposes of analyzing TSC's Open Dental records and what it reflects regarding Ms. Moore's experience, it is apparent she would only be familiar with a CCL procedure that TSC dentists performed with one of TSC's lasers that was described as it was and did not cause bleeding or require stitches, anesthesia or prolonged healing.

Ms. Rodriguez examined the history of the D4249 procedure description in TSC's Open Dental records and tracked the evolution of the auto-note language used to describe what the TSC dentists identified as a CCL procedure.  The original description of the procedure as far back as 2011 referenced the use of a Diode laser to perform the procedure:

Clinical crown lengthening of hard tissue. This procedure is employed to allow restorative procedure or crown with little or no tooth. structure exposed to the oral cavity. Crown lengthening requires the reflection of a flap and is performed in a healthy periodontal environment, as opposed to osseous surgery, which is performed in the presence of periodontal disease. Where there are adjacent teeth, the flap design may involve a large rsurgical area. A Diode laser was used to obtain accurate marginal integrity that would allow proper crown root ratio for proper retention.

In February 2015 TSC's description was modified to reference a Periolase MV-7 laser with two settings as the tool used to perform the procedure.

Clinical crown lengthening of hard tissue. This procedure is employed to allow restorative procedure or crown with little or no tooth. structure exposed to the oral cavity. Crown lengthening requires the reflection of a flap and is performed in a healthy periodontal environment, as opposed to osseous surgery, which is performed in the presence of periodontal disease. Where there are adjacent teeth, the flap design may involve a large surgical area. The **PerioLase MV-7 laser** in Diode and **LPT 1 and 2 settings** were used to obtain accurate marginal integrity that would allow proper crown root ratio for proper retention.

Three iterations of the procedure description later, in August of 2017, TSC's CCL procedure was modified to include reference to the Solea hard/soft tissue laser.

Clinical crown lengthening of hard tissue. This procedure is employed to allow restorative procedure or crown with little or no tooth. structure exposed to the oral cavity. Crown lengthening requires the reflection of a flap and is performed in a healthy periodontal environment, as opposed to osseous surgery, which is performed in the presence of periodontal disease. Where there are adjacent teeth, the flap design may involve a large surgical area. The PerioLase MV-7 laser in Diode and LPT 1 and 2 settings were used to obtain accurate marginal integrity that would allow proper crown root ratio for proper retention. Note that a handpiece and or piezotome may be used as necessary to reduce osseous tissue not removed via laser treatment.
**The Solea Hard/Soft tissue laser was also used to remove subsucular decay from the tooth with cementum melting of the hard tissue.**
This treatment is due to the patient s Diagnostic code:
ICD-9   523.40 Chronic Periodontitis
ICD-10  K05.30 Chronic Periodontitis

Two iterations of TSC's CCL description later, in March of 2018, the description was modified to include reference to Diode and NdYAG settings and the CO2 Solea hard/soft tissue laser.

Clinical crown lengthening of hard tissue. This procedure is employed to allow restorative procedure or crown with little or no tooth. structure exposed to the oral cavity. Crown lengthening requires the reflection of a flap and is performed in a healthy periodontal environment, as opposed to osseous surgery, which is performed in the presence of localized periodontal disease. Where there are adjacent teeth, the flap design may involve a large surgical area. The PerioLase MVP-7 laser in Diode and NdYAG modes and the CO2 Solea hard / soft tissue laser were used to obtain accurate marginal integrity that would allow proper crown root ratio for adequate retention. Note that a hand-piece and or piezotome may be used_to reduce osseous tissue not removed via laser treatment.
The periodontal condition is in remission in the area of the crown lengthening.
The Solea Hard/Soft tissue laser was also used to remove sub-sulcular decay from the tooth with cementum melting of the hard tissue.
This treatment is due to the patient s Diagnostic code:

ICD-9   523.40 Chronic Periodontitis
ICD-10  K05.30 Chronic Periodontitis

The Medical Necessity of this procedure is due to the lack of health of the emergence interproximal tissue from root surface of the tooth. **The crown is clinically subject to fracture and decay extending to minimal height and or sub-gingivally.**

There was one more modification to the description of the CCL procedure used in TSC's Open Dental records, but March of 2018 was the last modification to the description of the laser device or devices used to perform the CCL procedure at TSC.

From 2011 to 2022, Ms. Rodriguez calculated 9218 CCL entries in TSC's Open Dental records, 9204 of which described the procedure with a laser and did not describe bleeding or the use of sutures or anesthesia or a period of prolonged healing.  Of the fourteen CCL procedures that did not include a description of using a laser, seven contained no description of the

12

procedure at all and only one, from 2016, includes individualized notes describing a procedure without the use of a laser.

Dr. Price was not the only TSC dentist who described performing the CCL with a laser who used the same descriptions of the procedure as referenced above.  Ms. Rodriguez identified individually signed CCL entries by Dr. Angole and Dr. Thompson, both of whom described performing the CCL procedure with a laser and used the descriptions outlined above.

In summary, whether the procedure identified as a CCL by TSC dentists is the same procedure other dentists might identify as a CCL, during the entire time that Ms. Moore was a dental hygienist following graduation from school until she left Dr. Price's practice in December 2022, she only had exposure to a CCL procedure described as being performed with a laser and not involving bleeding, sutures, anesthesia or prolonged healing, irrespective of the TSC dentist with whom she worked.

e.  The SM Entries at TSC

Ms. Rodriguez analyzed TSC's records relating to references to CDT code 1510 and what that code reflects in TSC's files.  She determined that TSC used that code to identify many dental appliances, including but not limited to Hawley Bow appliances, bruxing appliances, bite guards, occlusal guards, clenching appliances, Essix appliances, bonded wire appliances, space maintenance aligners, surgical guide appliances, occlusion guard appliances, Gelb appliances, splint appliances, upper/ lower partials with labial wire appliances, regainers, retainers, night guards, and hard and soft mouth guards.  The actual definition of D1510 in the CDT manual is not a good description for many of the appliances coded that way at TSC, but TSC nevertheless used that code for all those appliances.

Open Dental has a "quick button" feature that allows a dental office to program the list of codes from which its providers should identify procedures or devices.  There are several CDT codes that could potentially describe some of the appliances that TSC described as a space maintainer under D1510, but none of those were programmed into TSC's list of ready options.  If TSC's Open Dental system had been properly programmed, there are several other codes that could have and should have been input into the system from which the TSC providers should have been trained to use to identify the various appliances.

To the extent a hygienist's credentials are used to make entries into Open Dental regarding appliances, Ms. Rodriguez would expect that to reflect a hygienist assisting the dentist outside the scope of her normal duties.  She would not expect the hygienist to have knowledge of codes used for appliances.

Ms. Rodriguez reviewed the manual Veis, Rob, & Christian, John (2004), The Principles of Appliance Therapy for Adults and Children, Chatsworth, California, Smile Foundation ("Principles of Appliance Therapy for Adults and Children").  Ms. Rodriguez recognized many of the TSC appliances identified as "space maintainers" in that manual and determined that if a person at TSC relied on that manual to identify the appliances in TSC's records, many of the appliances would be identified as "space maintainers."

Ms. Rodriguez examined TSC's Open Dental records for whether Ms. Moore's credentials were used to program any CDT codes into TSC's Open Dental system or whether Ms. Moore's credentials were used for any portion of the claims process at TSC.  She determined that Ms. Moore's credentials were not used for either the CDT programming function or the claims submission process.  That is consistent with what Ms. Rodriguez expected to see, since a dental hygienist typically has no coding responsibility or claims submissions responsibilities.

Ms. Rodriguez was able to identify Dr. Price's credentials and Ms. Porter's credentials with the functions of inputting CDT codes into TSC's Open Dental program and with the claims submission process. As such, Ms. Rodriguez found no entries in TSC's Open Dental records to infer that Ms. Moore's credentials were used to input potential CDT codes to use to identify appliances or to make entries of the code 1510 when no appliance was provided.

    V.    <u>Deletions of Dental Procedure Entries</u>

Ms. Rodriguez undertook an analysis of the deletions of procedures under the credentials of Ms. Porter and Ms. Moore, including during the period of the alleged conspiracy, 2017 to 2022. She determined that the credentials of both Ms. Porter and Ms. Moore were used to delete dental procedures, but the rate of deletions under Ms. Moore's credentials far outpaced the deletions under Ms. Porter's credentials. During the alleged conspiracy period, Ms. Moore's credentials were used to delete 12,973 entries from Open Dental that would have resulted in claims for payments worth $1,866,430.75, while Ms. Porter's credentials were used to delete 2,594 entries from Open Dental that would have resulted in claims for payments worth $655,898.57.

Ms. Rodriguez broke down the analysis by each procedure deleted. Focusing on the procedures the government identifies as problematic, Ms. Rodriguez noted that for the CCL procedure, during the 2017 to 2022 timeframe, Ms. Moore's credentials were used to delete 1382 CCL entries, which would have resulted in claims valued at $551,552.20, while Ms. Porter's credentials were used to delete 895 CCL entries, which would have resulted in claims valued at $349,987.60. Examining other procedures that the government's experts have also called into question, Ms. Rodriguez also analyzed deletions of entries for occlusal adjustments, gingival flaps and gingivectomy or gingivoplasty. Among those procedures she determined that,

between 2017 and 2022, Ms. Moore's credentials were used to delete 1566 occlusal adjustment procedure entries (limited and complete), which would have resulted in claims valued at $245,434.80, 810 gingival flap procedure entries, which would have resulted in claims valued at $86,125.80, and 164 gingivectomy/gingivoplasty procedure entries, which would have resulted in claims valued at $61,732.80.

To reiterate, from 2017 to 2022, Ms. Moore's credentials were used to delete entries that saved third party payors – almost entirely Medicaid, based on Dr. Price's patient base – more than $1.86 million.

VI.    Claims for Work Performed by Uncredentialed Providers

As a billing consultant for many dental practices, Ms. Rodriguez trains dental practices on compliance with insurance billing rules, which vary from payor to payor, whether government insurance plans like Medicare or Medicaid or the Medicaid managed care plans, or private insurance plans.  When she reviews electronic billing records for a client, there are certain red flags that are readily apparent in the records.  When she reviewed the electronic billing records of TSC, one of the red flags that jumped out to her was the frequency of claims when the ledger reflected services provided by one dentist but then the treating provider's identity was changed on the claim form.  To Ms. Rodrigue, this is a red flag of a classic fraud scheme of disguising that the services were provided by uncredentialed dentists.

The government takes the position that TSC obtained a group credentialing in late 2020. However, group credentialing still requires that the individual dentists be credentialed by Medicaid to treat its' beneficiaries.  Dr. Price was credentialed, but it appears that none of the associate dentists who worked there were credentialed or there would be no need to change the

treating provider's identity on the claim form.  As a licensed hygienist, Ms. Moore was qualified to treat Medicaid patients pursuant to Dr. Price's Medicaid credentials.  However, dentists have to be independently credentialed to provide services to Medicaid beneficiaries, including hygienist procedures.

Within the dental industry, it is generally known that Medicaid requires that each dentist treating Medicaid patients be individually credentialed by Medicaid.  On the ADA dental claim form submitted to Medicaid, section 48 requires the identity of the billing provider (such as TSC or Dr. Price) and section 53 requires the identity of the actual treating provider.  The pattern that was readily apparent within TSC's records is that Ms. Porter's credentials – the person the government has identified as responsible for submitting claims for payment to Medicaid – were being used to identify the treatment provider as Dr. Price whenever the associate dentists provided the treatment.  Ms. Rodriguez also identified many, many procedures performed by the non-credentialed dentists that were input into TSC's Open Dental system using Dr. Price's credentials, which created the appearance that Dr. Price had provided the treatment when he had not.

The ADA claim form includes an attestation that all information on the claim form is true.  Ms. Rodriguez expects the person responsible for submitting claims to Medicaid to be aware of Medicaid's billing rules, and one of the fundamental Medicaid rules is that each dentist servicing Medicaid beneficiaries must be independently credentialed to provide treatment.  She would also expect each dentist at TSC to be aware of that fundamental rule.

During the period of 2017 to 2021, Ms. Rodriguez calculated that TSC – presumably Ms. Porter – submitted 395 claims to Medicaid identifying Dr. Price as the treating provider when the claim form would have populated with the associate dentist who actually pro and Ms. Porter had

to manually and intentionally change the identity to Dr. Price, which resulted in payments to TSC from Medicaid of $281,892.25. This does not include the number of claims that were submitted when the associate dentist used Dr. Price's credentials to input the treatment provided from the outset.

The inference that Ms. Rodriguez would draw from TSC's records relating to claims submitted to Medicaid is that there was an understanding among Dr. Price, each of the non-credentialed dentists, and Ms. Porter to submit claims identifying Dr. Price as the treatment provider when those services were actually provided by one of the other dentists. That conduct is a common fraud in the dental industry that Ms. Rodriguez counsels her clients against, so to the extent there was a conspiracy among TSC employees to defraud Medicaid, she was surprised she did not see charges in the indictment against Dr. Price, Ms. Porter, and the non-credentialed dentists.

VII.    Claims to Medicaid when Procedures Unsigned

Medicaid requires that each provider sign the procedure notes before a claim for payment on that procedure is submitted to Medicaid for payment. Ms. Rodriguez ran a query of claims that TSC submitted to Medicaid for procedures that had not been signed by the TSC provider and determined that TSC and Ms. Porter submitted 381 claims for payment on procedures that had not been signed by the provider seeking payments of $221,559.04, on which Medicaid paid $173,170.71.

As referenced *infra*, some of those unsigned procedures were submitted by Ms. Porter on December 21, 2018, when Dr. Price was out of the country and Ms. Porter submitted claims to Medicaid for CCL and SM procedures that she represented had been provided by Dr. Price but

were not signed.  The government's indictment is alleging that Ms. Moore is responsible for those claims, even though the forensic analysis of the procedure entries indicates anyone at TSC could have made the entries, that Dr. Angole was available to provide the services and make the entries, or request Ms. Moore to make the entries for her, and the claims should not have been submitted until the procedure notes were signed by the provider who provided the services.

VIII.    Analysis of Specific Indictment Allegations

For each date relevant to Ms. Moore referenced in the indictment, Ms. Rodriguez undertook a wholistic analysis of TSC's records.  She examined, among other things, the schedule, the dentists scheduled to work that day, the patients scheduled to be seen and the dentist scheduled to see them, the times each patient was seated, the times each patient was dismissed, the procedures referenced relating to each patient, and when and where entries were made into TSC's Open Dental system relating to each patient.  While the identity of the person who actually made an entry or provided a service is routinely ambiguous, many other things were apparent through analysis of TSC's Open Dental records.

a.    November 26, 2018

Although Ms. Moore is not identified in the indictment for alleged fraudulent conduct on November 26, 2018, and although she is not identified as out of the office on November 26, 2018, Ms. Rodriguez reviewed records indicating Ms. Moore was out of the office on that date to attend a funeral and makes that assumption for her analysis of TSC's records.

The records for November 26, 2018, reflect that someone used Ms. Moore's credentials to log in at TSC-OP4 at 3:01 pm.  For the balance of November 26, 2018, 79 entries were made under Ms. Moore's credentials for three patients at that terminal, including patients 5256, 3955

and 4511, for whose procedures not only were Ms. Moore's credentials used to make the entries, but her electronic signature was affixed to some of the records that day. Other entries were made under Ms. Moore's credentials but signed the next day or later under Dr. Price's credentials. There were no entries at any other terminal using Ms. Moore's credentials that day, which is consistent with her being out of the office.

November 26, 2018, was within the time period when both Dr. Angole and Ms. Porter were not using their own credentials for a period of months, yet they appear to have made hundreds of entries in TSC's Open Dental that day using the credentials of others.

   b.  <u>November 27, 2018</u>

For the following day, November 27, 2018, the government alleges in its indictment that Ms. Moore made an entry into Open Dental for space maintainers for Patient 5126 that were not provided.

The entries into Open Dental attributable to Ms. Moore relating to Patient 5126 (LD) on November 27, 2018, were entered at 1:49 pm at TSC-OP4 under Ms. Moore's Open Dental credentials. The most recent credentials to log on to that station were those of Ms. Moore's on November 26, 2018, at 3:01 pm, when Ms. Moore was not in the office. As noted above, the records reflect someone else used her credentials to log in on that date at that time and at that location. There were 227 consecutive entries at TSC-OP4 from the log on time on November 26, 2018, and the log off time of approximately 4:00 pm on November 27, 2018, including the entries for Patient 5126 (LD) on November 27, 2018, at approximately 1:49 pm, all under Ms. Moore's credentials. Therefore, any person within the office using terminal TSC-OP4 during those two days would have made entries into Open Dental under Ms. Moore's credentials.

The Open Dental records for November 27, 2018, further reflect that at least Dr. Price was available at the time of the entries to make the entries himself using Ms. Moore's credentials, or direct a dental assistant or Ms. Moore, as dental hygienist, to make the SM entries into the records of Patient 5126, and provide to the patient whatever appliance TSC used D1510 to describe.

As referenced above, TSC used the identifier "space maintainer D1510" to identify a laundry list of dental appliances.  For this particular patient, the TSC records reflect that an upper and lower soft night guard appliance was delivered to Patient 5126 for treatment of teeth 7 to 11 and 21 to 27 and the lab order indicated the dentist did not want the appliance on the patient's restoration.  The Veis & Christian appliance therapy "space maintainer" manual used by TSC makes reference to soft night guard appliances.

As noted above, the credentials of Dr. Price and Ms. Porter were the only credentials used to enter the CDT codes available to TSC Open Dental users from which to pick to identify appliances.  There were no CDT codes input into TSC's Open Dental system using Ms. Moore's credentials.  If a code other than D1510 should have been used to identify the soft night guard delivered to patient 5126, then Dr. Price or Ms. Porter should have input that code into TSC's Open Dental system and instructed the providers at TSC, including Ms. Moore, to use that code.

As for the SM entries for Patient 5126 on November 27, 2018, Dr. Price's credentials were used to sign for the completion of that appliance at 4:45 pm on that same day at TSCOPERATORY4.

Finally, there are entries under Ms. Moore's credentials in TSC's Open Dental on November 27, 2018, at two different locations at the same time.

    c.  <u>December 20 and 21, 2018</u>

The government alleges in its indictment that Ms. Moore made false entries into TSC's Open Dental on December 21, 2018, when Dr. Price was out of the country, but it is important to analyze both December 20, 2018, and December 21, 2018, to better understand the entries into TSC's Open Dental system.

Ms. Rodriguez reviewed records consistent with Dr. Price's travel to Europe from December 19, 2018, to December 24, 2018. That is, the records reflect Dr. Price was out of the country on both December 20, 2018, and December 21, 2018. These dates are within the nine-month period when Dr. Angole was treating patients at TSC yet never used her Open Dental credentials, and they are within the period of more than two months when Ms. Porter never used her Open Dental credentials. Instead, Dr. Angole and Ms. Porter were using the credentials of others, primarily those of Dr. Price and Ms. Moore.

While Dr. Price was out of the country on December 20, 2018, his Open Dental credentials were used to: make entries at six separate Smile Center computer stations during the course of the day (TSCFRONTDESK1, TSCFRONTDESK2, TSCOPERATORY1, TSCOPERATORY2, TSCOPERATORY3 and XRAY-PC), including to **log in** at TSCFRONTDESK2 at 8:45 am and to **log out** of that terminal at 4:13 pm; to **log in** at TSCOPERATORY2 at 12:20 pm; and to **log in** to TSCOPERATORY1 at 12:34 pm. Over the course of the day on December 20, 2018, at the referenced six terminals, there were 780 entries made into the Open Dental system under Dr. Price's credentials; 597 entries at TSCFRONTDESK1, 136 entries at TSCFRONTDESK2, 40 at XRAY-PC, one at TSCOPERATORY1, one at TSCOPERATORY2, and five at TSCOPERATORY3. 33 of the

780 entries documented dental procedures, one of which was input at TSCFRONTDESK1 and

32 of which were input at TSCFRONTDESK2.

Dr. Price's credentials were used to log in to TSCOPERATORY1 on December 20, 2018,

at 12:34 pm and were not logged off until December 27, 2018, at 2:49 pm, which means Dr.

Price's credentials were open at that location for more than seven days, including while he was

out of the country.  Dr. Price's credentials were used to log in to TSCOPERATORY2 on

December 20, 2018, at 12:20 pm and were not logged off until December 27, 2018, at 3:33 pm,

making a second operatory location where Dr. Price's credentials had a terminal open for more

than seven days, including while he was out of the country.  Dr. Price's credentials were used to

log in to TSCOPERATORY3 on December 18, 2018 (when Dr. Price was still in town), at 2:37

pm and were not logged off until January 4, 2019, at 3:23 am, so TSCOPERATORY3 was open

under his credentials for the entire time when he was out of the country.  In short, Dr. Price's

credentials were used to open two operatory terminals and three operatory terminals were

otherwise open while he was out of the country and available to anyone in the office to make

entries using his credentials.

Based on the patterns of use at terminals within TSC and witness statements about the

terminals used by Ms. Porter, the associate dentists and Ms. Moore to make entries into TSC's

Open Dental, coupled with both Ms. Porter and Dr. Angole not using their credentials at all

during the months surrounding December 20, 2018, the inference to draw from the Open Dental

data is that Ms. Porter used Dr. Price's credentials to log in to TSCFRONTDESK1 and make 597

entries into TSC's Open Dental using Dr. Price's credentials on December 20, 2018, most of

which were administrative in nature, and that Dr. Angole used Dr. Price's credentials to log in to

and make some or all of the entries at TSCFRONTDESK2, which related to the patients on her schedule for that day and included entries that were procedural in nature.

On the following day, December 21, 2018, the pattern was very similar to December 20. Over the course of the day on December 21, 2018, Dr. Price's OD credentials were used to make entries at, again, six separate Smile Center computer stations during the course of the day (TSCFRONTDESK1, TSCFRONTDESK2, TSCOPERATORY1, TSCOPERATORY2, TSCOPERATORY3, and XRAY-PC), including being used to **log in** on December 21, 2018, at each of the three terminals at the front desk:  TSCFRONTDESK1 at 10:27 am, TSCFRONTDESK2 at 8:42 am and TSCFRONTDESK3 at 3:48 pm.  Over the course of December 21, 2018, at the referenced six terminals, there were 670 entries made into the Open Dental system under Dr. Price's credentials: 533 entries at TSCFRONTDESK1, 111 entries at TSCFRONTDESK2, four at TSCFRONTDESK3, 14 at TSCOPERATORY1, six at TSCOPERATORY2, and two at TSCOPERATORY3.  26 of the 670 entries documented dental procedures, one of which was input at TSCFRONTDESK1 and 25 of which were input at TSCFRONTDESK2.

As noted regarding the previous day, Dr. Price's credentials were used to **log in** to TSCOPERATORY1 on December 20, 2018, at 12:34 pm and were not logged off until December 27, 2018 at 2:49 pm.  Dr. Price's credentials were used to **log in** to TSCOPERATORY2 on December 20, 2018, at 12:20 pm and were not logged off until December 27, 2018 at 3:33 pm.  Dr. Price's credentials were used to log in to TSCOPERATORY3 on December 18, 2018 (while Dr. Price was still in town), at 2:37 pm and were not logged off until January 4, 2019, at 3:23 am.  All entries at those terminals during those

periods of time by anyone in the office were made using Dr. Price's credentials, whether he was in the office or using that terminal at the time of the entry.

The only other credentials used to make entries into TSC's Open Dental system on December 21, 2018, were those of Ms. Moore, under whose credentials there were 375 entries documenting 79 procedures. (As referenced above, there were NO entries using the credentials of Ms. Porter or Dr. Angole on December 21, 2018.) Ms. Moore's credentials were used at four locations: 230 entries at XRAY-PC, 132 entries at TSCOPERATORY4, 11 entries at TSCOPERATORY6, and two entries at TSCFRONTDESK3. The 79 dental procedures were input at XRAY-PC and TSCOPERATORY4. The Open Dental records reflect that 14 patients were seen at The Smile Center on December 21, 2018, while Dr. Price was away from the office.

The schedule for December 21, 2018, reflects that Dr. Angole was the dentist in the office that day and that Ms. Moore was the hygienist. Dr. Price was marked as out of the office. All of the foregoing activity reflects that the office manager, Ms. Porter, and Dr. Angole, used the credentials of Dr. Price and/or Ms. Moore throughout the days of December 20, 2018 and December 21, 2018, and that it is virtually impossible to know when Ms. Moore was using her credentials to make entries and when Ms. Porter or Dr. Angole were using Ms. Moore's credentials to make entries, although Ms. Porter's history reflects most of her entries were made at the front desk and not in one of the operatories.

With respect to the government's allegation that Ms. Moore made entries into the Open Dental system relating to CCL procedures and space maintainers on Patient 2143 (JB), which allegedly occurred at TSCOPERATORY4, the Open Dental records reflect that Ms. Moore's credentials were used to open the terminal at TSCOPERATORY4 on December 18, 2018, at 12:40, and she was not logged off at that terminal until December 28, 2018, at 15:22. During

that period of time, there were 300 entries at TSCOPERATORY4.  Therefore, all 300 entries into Open Dental at that terminal during those eleven days – including December 21, 2018 – were made under Ms. Moore's credentials, irrespective of who made the entries.

When analyzing the flow of all patients throughout the day of December 21, 2018, and the treatments identified as have been provided, including to patient 2143 (JB),  and knowing Dr. Angole was not using her own credentials at any time that day (or the surrounding nine months), it is impossible to determine when Ms. Moore was using her credentials to input information about dental procedures, or when Dr. Angole was using Ms. Moore's credentials to make entries about dental procedures, and/or when Dr. Angole was requesting  Ms. Moore to make entries of procedures she had performed.  The TSC records reflect, however, that Dr. Angole was available to provide the CCL and SM services during the time when patient 2143 was seated for treatment.

Although it is impossible to know who made or authorized the entries for the CCL and SM procedures to patient 2143 (JB) on December 21, 2018, notably, while Ms. Moore signed the hygiene procedures for that patient that day, the dental procedures, including the CCL and SM procedures, were not signed that day.  Medicaid requires that dental procedures be signed before claims are submitted for payment.  Nevertheless, Ms. Porter submitted claims to Medicaid for payment for the CCL and SM procedures – unsigned  -- on the same day, December 21, 2018.  Ms. Porter also indicated on the Medicaid claim form that Dr. Price was the treating provider for the CCL and SM services when she submitted the claim, even though she knew Dr. Price was not in the office that day.

The records reflect the CCL was performed with a laser, and other TSC records reflect that Dr. Angole performed CCLs at TSC with a laser.  The lab records for patient 2143 (JB) reflect that an order for an appliance identified as a "space maintainer/regainer" was created on

November 15, 2018, sent to the lab on November 16, 2018, and received from the lab on December 3, 2018. Patient 2143 (JB)'s next appointment after TSC's receipt of the appliance from the lab was December 21, 2018, when the appliance would have been delivered to the patient.

Finally, there are multiple occasions on December 21, 2018, when Ms. Moore's credentials are being used to make entries into TSC's Open Dental records at two different terminals in fewer than ten seconds, including as few as one second.

### d.  April 11, 2019

The government alleges that Ms. Moore made false entries on April 11, 2019, relating to Patient 1446 (MB).

Ms. Moore's credentials were used to make entries for Patient 1446 (MB) on April 11, 2019, at TSC-OP6. TSC-OP6 was opened under Ms. Moore's credentials on April 10, 2019, at 1:44 pm and were not logged off until April 16, 2019, at 3:01 pm.  During those seven days, Ms. Moore's credentials were used to input 179 entries at that terminal, which means that anyone at TSC making entries at that location during that period of time, including April 11, 2019, used Ms. Moore's credentials to do so.

TSC's Open Dental records reflect that Patient 1446 (MB) and her child Patient 4828 (JB) were scheduled to be seen on April 11, 2019, at 12:30 pm and 12:00 pm, respectively. Child patient JB and mother patient MB were seated at the same time at 12:10 pm at two different stations.  Both Patient JB and Patient MB were dismissed at 12:46 pm.  Although mother and child were being treated simultaneously at two TSC stations, the entries for treatment provided for both patients were entered at TSC-OP6, which was open under Ms. Moore's

credentials at the time. The Open Dental records reflect that Patient JB, five years old at the time, received an oral examination, a prophylaxis cleaning and a fluoride treatment. The Open Dental records reflect that adult patient MB received an oral evaluation, full mouth debridement, fluoride treatment, four CCLs, four pulp vitality tests, a space maintainer, and an occlusal adjustment. The cleanings, full mouth debridement and fluoride treatments were within Ms. Moore's scope of license (along with the oral evaluations when in attendance with the dentist), and the remaining procedures on both patients are dental procedures outside the scope of a hygienist's license.

Dr. Price had a patient scheduled for noon, Patient 5702 (FC), who was not seated until 12:42 pm, just after mother and son patients JB and MB were dismissed. Therefore, Dr. Price was available to provide the dental procedures for Patient 1446 (MB) that were identified in the records, including the laser CCLs and SM, and/or enter those procedures using Ms. Moore's credentials, and/or request that Ms. Moore or another assistant make the entries for those dental procedures.

Ms. Moore's credentials were used at TSC-OP6 between 1:15 p m and 1:23 pm to input the treatment plans and completed treatments for both Patient 1446 (MB) and her child Patient JB. At the same time, Ms. Moore's credentials electronically signed the child prophylaxis treatment, the full mouth debridement and the fluoride treatments regarding both patients, treatments falling under Ms. Moore's scope of license. At 5:08 pm at TSCFRONTDESK2, Dr. Price's credentials were used to electronically sign the dental procedures of four CCLs, four pulp vitality tests, the occlusal adjustment and the space maintainer.

OD's Daily Procedure and Income Report for April 11, 2019, reflects that Ms. Moore provided the cleanings, full mouth debridements and fluoride treatments for patients MB and JB,

and that Dr. Price conducted the oral examination on both patients and provided the four CCLs, four pulp vitality tests, a space maintainer, and an occlusal adjustment to Patient 1446 (MB). Therefore, TSC's Open Dental records indicate that Ms. Moore provided hygiene treatment for mother and child, and Dr. Price provided the dental treatments to mother and child, including relating to the laser CCL and SM entries and entered them under Ms. Moore's credentials, or requested that they be entered on his behalf. The records reflect that Dr. Price is responsible for the entries he signed and Ms. Moore is responsible for the entries she signed.

As for the SM for patient 1446, the Open Dental records appear to reflect that TSC submitted a lab order for an upper and lower Essix in November, 2018, and that patient 1446's first visit to TSC after the lab delivered the appliance was the April 11, 2019, visit.

But TSC's Open Dental entries for April 11, 2019, demonstrate, again, several ways that the user credentials at TSC are unreliable to identify the person who input data into the system. Dr. Angole was on the schedule to see no fewer than seven patients on April 11, 2019, although it appears one may have been a no-show. The schedule for that day reflects that Dr. Angole was scheduled to see patients steadily from 10:00 am until 3:15 pm: Patient 4198 (JMS), Patient 5629 (NC), Patient 5714 (LD), Patient 772 (MF), Patient 2638 (MD), and Patient 1966 (SD). However, the Open Dental audit log reflects that there were zero entries made in TSC's system under Dr. Angole's credentials that day. The Daily Procedures and Income Report, on the other hand, reflects that Dr. Angole provided the treatment to at least to Patients 5629 (NC), 5714 (LD), and 4198 (JMS), while the Daily Procedures and Income Report identifies Dr. Price as the provider for the other patients on Dr. Angole's schedule, Patients 772 (MF) and 2638 (MD). For the six patients on the schedule to be seen by Dr. Angole, there were a total of 256 entries made into Open Dental that day for those patients: 120 were input under Andrea Porter's credentials,

124 under Dr. Price's credentials, 9 were input under Keidi Moore's credentials, and three under Maria Thompson's credentials. None were input under Dr. Angole's credentials.

As another illustration of the unreliability of TSC's user credentials identifying the person who input the information into its Open Dental system, on April 11, 2019, Ms. Moore's credentials were used to make entries at two different locations at exactly 12:53 pm only ten seconds apart.

        e.   <u>August 1, 2019</u>

The government's indictment alleges that Ms. Moore made false entries into TSC's Open Dental records on August 1, 2019, relating to CCL and SM procedures on Patient 2768 (MK).

The CCL and SM procedures regarding patient 2768 (MK) were entered at TSC-OP6 at 12:44 pm and 12:48 pm using Ms. Moore's credentials. TSC's records reflect that Ms. Moore's credentials were used to log in to TSC-OP6 on July 29, 2019, at 9:54 am, and she was not logged off until August 1, 2019, at 3:48 pm. In the interim, there were 981 consecutive entries into Open Dental at that terminal under Ms. Moore's credentials, including on August 1, 2019, irrespective of the person at TSC who actually made the entries.

TSC's records reflect that Dr. Price's credentials were first used on August 1, 2019, at TSC-FD2 at 9:48 a.m. to check a chart, and that Patient 2768 (MK) was seated at 10:12. Both Dr. Angole and Dr. Price had patients scheduled for that day, but when analyzing patient flow for the entire day and the procedures recorded for each patient and when Patient 2768 (MK) was seated, both Dr. Price and Dr. Angole would have been available to provide the CCL and SM procedures to Patient 2768 (MK), and/or make the entries for those procedures under Ms. Moore's credentials, and/or request that the entries be made for them. The records reflect that

the CCL procedures were provided to Patient 2768 with a laser and that the SM appliance provided to the patient was a mouthguard.

In addition, patient 5870 (SB) was scheduled for a prophylaxis and fluoride treatment – hygienist treatments – and was seated at 12:36 pm. The Daily Procedures and Income Report reflects that Ms. Moore provided the prophylaxis and fluoride treatment to Patient 5870 (SB), so it is much more likely that Ms. Moore was providing the prophylaxis and fluoride treatment to Patient 5870 (SB) at 12:44 pm than making entries about patient 2768 (MK's) dental procedures, including the CCL and SM entries, at TSC-OP6, where her credentials had been open since July 29, 2019.

Also on August 1, 2019, Dr. Angole was scheduled to see six patients that day, four of whom showed up. Of the four patients who reported for treatment on August 1, 2019, there are only six entries made into TSC's Open Dental records under Dr. Angole's credentials during the entire day, and 173 entries made for those patients under the credentials of others, including 99 under Dr. Price's credentials, 63 under Ms. Porter's credentials, and seven under Ms. Moore's credentials. There were 21 dental procedures entered into TSC's Open Dental records for Dr. Angole's patients that day, all of which were entered under Dr. Price's credentials. Not one dental procedure was entered under Dr. Angole's credentials. In short, during a day when she was functioning as a dentist at TSC on August 1, 2019, Dr. Angole recorded providing zero dental procedures to patients for the entire day.

As a final observation regarding TSC's Open Dental records for August 1, 2019, Ms. Moore's credentials were used to make entries at two different terminals at exactly 1:38 pm and 1:58 pm, indicating that twice that day, two people were making entries using Ms. Moore's credentials at different locations of the office at the same time.

  f. <u>February 20, 2020</u>

  The government alleges that Ms. Moore created false entries on February 20, 2020, in the Open Dental records regarding CCLs and four space maintainers for patient 1214 (TG). Ms. Rodriguez determined that the entries to which the government refers were entered under Ms. Moore's credentials at TSC-OP6. Ms. Moore's credentials were used to log on to TSC-OP6 on February 18, 2020, and she was not logged off at that location until February 28, 2020, during which time there were 1784 consecutive entries under Ms. Moore's credentials, and none under anyone else's credentials; therefore, each entry at that location during the eleven days and throughout the day on February 20, 2020, was input with Ms. Moore's credentials, irrespective of who used the terminal to make the entry.

  The OD Daily Procedures Report for February 20, 2020, reflects that Ms. Moore provided the hygiene care on Patient 1214 (TG) and that Dr. Price provided the dental care, including the four CCLs and four space maintainers. Ms. Rodriguez reviewed the patient flow for February 20, 2020, and determined that Dr. Price was available to provide the laser CCL procedure and SM treatment to patient 1214 and/or make the entries for the procedures at the terminal open under Ms. Moore's credentials, and/or request that Ms. Moore or another assistant make the entries to record the procedures.

  The space maintainer entries relating to patient 1214 (TG) from February 20, 2020, appear to relate to a Hawley Bow appliance. The records for that patient reflect an attempted repair at the lab of a Hawley Bow appliance, which the Veis Christian manual in Dr. Price's office identified as a space maintainer, in September 2019, before a new appliance was ordered for the patient in November 2019 and delivered to TSC's office in December 2019. It appears

that patient 1214 (TG) was next at TSC to allow delivery of the Hawley Bow appliance on February 20, 2020.

While the OD records reflect that Dr. Price provided the dental procedures on patient 1214 (TG), including the CCLs and space maintainer, the Open Dental records further reflect that Ms. Moore had moved from patient 1214 (TG) to perform the hygiene procedures of a prophylaxis and fluoride treatment on Patient 2170 (VD).  The hygiene entries for Patient 2170 (VD) were made under Ms. Moore's credentials at TSC-OP6 at 11:05 am, and later marked completed and signed by Ms. Moore with notes at 11:24 a.m. and 11:25 a.m.  The Open Dental records further reflect that after Dr. Price finished the dental procedures on Patient 1214 (TG), he followed Ms. Moore to patient 2170 (VD) and provided the dental services to her.  The OD records reflect dental procedures of four pulp vitality tests and four laser CCLs were input under Ms. Moore's credentials at 11:26 am, just after Ms. Moore had signed her hygiene entries.  The inference to be drawn from the OD records is that Dr. Price was available to provide the dental procedures to Patient 2170 and record the procedures using Ms. Moore's credentials, which were open at that location for eleven days, or request that Ms. Moore or another assistant make the entries to record the procedures.  Although Ms. Moore signed for the hygiene procedures that day, Dr. Price did not sign for the dental procedures until April 21, 2020, which he did in cursive with the computer mouse.

g.  July 13, 2020

The government's indictment alleges that on July 13, 2020, Ms. Moore created false entries in Open Dental relating to CCL procedures for Patient 3632 (BS) when, the government alleges, Dr. Price was out of the country.

33

The CCL entries relating to Patient 3632 (BS) were entered on July 13, 2020, at station TSC-XRAY at 3:52 pm and 3:54 pm.. Ms. Moore's credentials were used to log on to TSC-XRAY on July 8, 2020, and she was not logged off at that location until July 14, 2020.  During the seven days that terminal was open under her credentials, there were 342 consecutive entries under Ms. Moore's credentials and none under anyone else's credentials. Therefore, whatever TSC personnel made entries at TSC-XRAY during those seven days, including all day on July 13, 2020, the entries went in under Ms. Moore's credentials.

The US Customs records produced by the government do not reflect travel by Dr. Price out of the country in 2020.  Ms. Rodriguez examined the patient flow at TSC on July 13, 2020, and, assuming Dr. Price was not out of the country, he was available to provide the laser CCL procedures to patient 3632 (BS) and/or make the entries about those procedures under Ms. Moore's credentials or request that Ms. Moore or another assistant make the entries for him.

Ms. Moore's electronic signature was entered at 2:07 pm to indicate completion of the oral exam (typical for the hygienist to sign when performed in conjunction with the dentist) and bitewing images for patient 3632, and Ms. Moore's electronic signature was entered at 3:51 pm at TSC-XRAY for the patient 3632's scaling and root planing.  Each procedure reflecting Ms. Moore's electronic signature was within the scope of her license.

At 5:23 pm and 5:24 pm at TSC-FD2, after Ms. Moore's work day, using Dr. Price's Open Dental credentials, Dr. Price's electronic signature was entered for Patient 3632's (BS) dental procedures of the pulp vitality test, a resin based composite, a porcelain crown, two laser CCLs, a wax try-in, another pulp vitality test, another resin based composite, another porcelain crown, and two more CCLs.

The other dentist scheduled to see patients that day was Dr. Clarke. Ms. Rodriguez analyzed all patient flow at TSC over the course of July 13, 2020, and determined that, even if Dr. Price was not in the office on July 13, 2020, Dr. Clarke would have been available to provide the laser CCL and SM procedures to patient 3632 (BS) when she was seated and/or make the entries for those procedures under Ms. Moore's credentials or request that Ms. Moore or another assistant make the entries for her.

The OD records reflect that the credentials of five people were used to make entries into the system on July 13, 2020: Ms. Porter's credentials were used to make 327 entries at TSC-FD1; Keidi Moore's credentials were used to make 255 entries at TSC-XRAY, TSC-OP5 and TSC-OP6; Krystal Clarke's credentials were used to make 150 entries at the TSC-FD3, and at TSC-OP2, TSC-OP3, and the sterilizer TSC-STERILIZE; Dr. Price's credentials were used to make 110 entries at the front desk TSC-FD2 and TSC-OP1, and N. Allen's credentials were used to make one entry on TSC-OP4. Dr. Price's credentials were not used on TSC-FD2 until 4:41 pm and the entries under his credentials for Patient 3632 (BS) were input at TSC-FD2 at 5:23 pm and 5:24 pm.

Finally, on two occasions on July 13, 2020, Ms. Moore's credentials were used at two different terminals to make entries into TSC's Open Dental at the exact same time to the second.

### h. June 24 and 28, 2021

The government alleges that on June 24 and June 28, 2021, Ms. Moore created false entries for CCL procedures for patients 5313 (AH) and 1446 (MB) that were not provided while Dr. Price was out of the country. The alleged false CCL entries for both dates were entered at TSC Operatory 1.

TSC's Open Dental records reflect that Ms. Moore's credentials were used to log in at TSC Operatory 1 on June 14, 2021, and she was not logged off from that terminal until the end of the day on June 28, 2021.  During that time there were 1487 consecutive entries under Ms. Moore's credentials at that terminal and none under anyone else's credentials.  Therefore, the terminal at TSC Operatory 1 was available to anyone in the office to make entries during that two-week period using Ms. Moore's credentials, including the CCL entries the government has attributed to Ms. Moore on June 24, 2021, and June 28, 2021.

Notably, there are entries at TSC Operatory 1 on Friday, June 25, 2021, under Ms. Moore's credentials when the schedule indicates Ms. Moore was out of the office.  TSC's Open Dental records reflect that Dr. Thompson was scheduled to see several patients on June 25, 2021, including Patient 4661 (LH).  While the records reflect that Dr. Thompson saw and treated that patient, there are several entries for this patient on that day using Ms. Moore's credentials at TSC-OP1, including for prescriptions issued by Dr. Thompson and a referral to an oral surgeon issued by Dr. Thompson.  In fact, TSC's records reflect that dentists frequently used the credentials of Ms. Moore and Ms. Porter to make entries for prescriptions, but the dentists signed the prescriptions for them to be processed by a pharmacy.

Turning specifically to the CCL entries on June 24, 2021, which the government is attributing to Ms. Moore, TSC-OP1 was available all day to anyone in the office, and all entries went in under Ms. Moore's credentials.  The Open Dental data on patient flow and dentist availability reflects that two dentists, Dr. Galiber and Dr. Thompson, would have both been available to provide the laser CCL procedures and/or input those procedures at TSC-OP1 under Ms. Moore's credentials or request that Ms. Moore input the procedures into Open Dental for them.

On June 28, 2021, TSC's records reflect that Dr. Thompson and Dr. Clarke were scheduled to see patients that day, although Dr. Clarke's schedule indicated only one patient and that patient canceled. However, the cancelation of Dr. Clarke's patient was not entered into TSC's Open Dental by Ms. Porter until September 15, 2021, so the records are ambiguous whether Dr. Clarke was in the office on June 28, 2021. Nevertheless, when analyzing TSC patient flow throughout the day on June 28, 2021, Dr. Thompson and possibly Dr. Clarke were available to provide the laser CCL treatment when Patient 1446 was seated and/or make the entries at TSC-OP1 for that procedure using Ms. Moore's credentials or request that Ms. Moore or another assistant make the entries.

IX.    Conclusion

Some government assumptions in its prosecution of Ms. Moore are inconsistent with typical dental office procedures, such as the administrative function of entering procedures into electronic dental records versus the provider signing for the services to confirm they were provided, or the manner in which dentists, dental hygienists and dental assistants will rotate to the location of patients rather than move patients during an appointment. Apart from the government's misunderstanding of such fundamentals, TSC's Open Dental records do not reflect what the government alleges in its indictment.

TSC's Open Dental records reflect that the program was not used as designed and that users were not ensuring that entries reflected the actual provider of services by ensuring that entries were made under each user's credentials. Instead, TSC's records reflect that terminals were left open under one user's credentials – often those of Ms. Moore – for days and weeks at a time such that anyone using a terminal was making entries under credentials open at the terminal

at the time of the entry.  There is very little reliability that the credentials used to make entries into TSC's Open Dental records reflect the person who actually made the entries.

TSC's Open Dental records reflect that certain users, particularly Dr. Angole and Ms. Porter, did not use their own credentials for months at a time, thereby ensuring that all entries made by those users during those periods of time misidentified the person who made the entries. At other times, even if Dr. Angole used her own credentials, she made so few entries on some days relative to the number of patients she treated it is apparent she also used the credentials of others on those days to make entries into TSC's Open Dental records, including the credentials of Dr. Price and Ms. Moore.  Other dentists also used Ms. Moore's credentials to make entries into TSC's Open Dental records.

TSC's Open Dental data reflects that Ms. Moore's credentials and Ms. Porter's credentials were used to delete many dental procedures, although the rate of deletions under Ms. Moore's credentials far exceeded the deletions under Ms. Porter's credentials.  During the period of 2017 to 2022, Ms. Moore's credentials were used to delete entries that saved Medicaid and other third party payors more than $1.86 million in claims that would have been submitted but for those deletions.

TSC's Open Dental records reflect that Ms. Porter routinely changed the identity of the treatment provider or misidentified the identity of the treatment provider in TSC's records before submitting claims to Medicaid for services provided by, apparently, non-credentialed dentists and instead identified Dr. Price – who was credentialed by Medicaid -- as the treating provider.

Although a TSC employee's Open Dental user credentials are not a reliable indicator of the identity of the person who made any given CCL entry into TSC's Open Dental records, when

the CCL procedure was entered into TSC's records, the notes described a procedure performed with a laser that did not cause bleeding or require sutures, anesthesia, or a lengthy period of healing,  such that an employee who worked at TSC for the period of time that Ms. Moore worked there would understand that is how the CCL procedure was performed.

Although a TSC employee's Open Dental user credentials are not a reliable indicator of the identity of the person who made any given SM entry into TSC's Open Dental records, TSC's records reflect that TSC identified many dental appliances as space maintainers and coded them D1510.  Whether that was the proper code for the many appliances identified in TSC records as a space maintainer, a hygienist would not be expected to know of coding options for appliances and, if relying on the Veis & Christian space maintainer manual, would understandably identify the appliances as space maintainers.  Moreover, it is the dentist's responsibility to ensure the appliances and procedures are properly coded and to ensure the providers and employees of the office identify them properly.

On the dates the government identifies in the indictment that Ms. Moore allegedly made false entries into TSC's Open Dental system, her credentials were open for days or weeks at a time at the terminal where the entries were made, available for entries by anyone in the office, and there was always a dentist available to provide the dental treatments and/or make the entries for the dental procedures under Ms. Moore's credentials and/or request that Ms. Moore or another assistant make the entries on behalf of the dentist.

Respectfully submitted,

*John Pierce*

John P. Pierce, DC Bar No. 475101
CJA Counsel for Defendant Moore

39

I HAVE READ AND APPROVE OF THE FOREGOING:

*Kristal Rodriguez*
_____
Kristal Rodriguez

## CERTIFICATE OF SERVICE

I certify that on October 17, 2025, the foregoing was filed via e-file, which automatically serves a copy on all parties.

*John Pierce*
_____
John P. Pierce